Filed 7/20/26  In re K.C. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re K.C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>K.C.,<br><br>    Defendant and Appellant. | D086077<br><br>(Super. Ct. No. J244416) |

APPEAL from a judgment of the Superior Court of San Diego County, Ana Espana, Judge.  Affirmed.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Senior Assistant Attorney General, Christopher P. Beesley and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

After finding then 17-and-a-half-year-old K.C. not amenable to rehabilitation under the juvenile court's jurisdiction, the juvenile court granted the People's motion to transfer his murder case to criminal court. K.C. appeals, asserting that the order is not supported by substantial evidence. We affirm.

## BACKGROUND

### I.

### *Charged Offenses*

In an amended juvenile wardship petition, the San Diego County District Attorney charged K.C. with murder (Pen. Code, § 187, subd. (a); count 1), attempted robbery (*id.*, §§ 664, 211; count 2), and assault by means of force likely to produce great bodily injury (*id.*, § 245, subd. (a)(4); count 3). The District Attorney alleged a special circumstance that K.C. committed the murder in the attempted commission of robbery (*id.*, § 190.2, subd. (a)(17)); and that, as to both the murder and attempted robbery, K.C. committed the offenses for the benefit of a criminal street gang (*id.*, § 186.22, subd. (b)(1) & (5)) and that a principal personally and intentionally discharged a firearm, causing great bodily injury or death (*id.*, § 12022.53, subds. (d) & (e)(1)). The District Attorney also alleged K.C. was eligible to be transferred to criminal court (Welf. & Inst. Code,[1] § 707, subd. (a)(1)). The petition was based on the following alleged facts.[2]

---

[1]    All further undesignated statutory references are to the Welfare and Institutions Code.

[2]    Our statement of the facts takes into consideration that the determination of whether a minor is amenable to the juvenile court system is

At about 10:54 p.m. on March 28, 2024, Andres Dominguez, a delivery driver for a marijuana dispensary called Sticky Green SD (Sticky Green), was found unresponsive in his car that had crashed two blocks from a dead-end street. He died of a single gunshot wound to his torso.

The investigation revealed that at 7:15 p.m. earlier that night, then 16-year-old K.C. texted his 21-year-old friend Alex Espinoza and suggested they rob a marijuana delivery service. K.C. and Espinoza were both members of the Sherman Heights gang. K.C. asked Espinoza, "Lets come up on a delivery service?" and Espinoza agreed. K.C. then texted Sticky Green to determine its closing time. K.C. sent Espinoza a screenshot of the Sticky Green website with pictures, descriptions, and pricing of different types of marijuana. The pair agreed to order 2 ounces of marijuana and "some shrooms."

K.C., Espinoza, Espinoza's girlfriend, and 18-year-old Brayan Morales (another Sherman Heights gang member), went to the dead-end street in different cars. At about 8:20 p.m., K.C. called Sticky Green three times and texted it with an order for marijuana. Three minutes later, K.C. sent another text message to Sticky Green asking for its estimated time of arrival.

K.C. texted Morales, "Should I whip thang." Morales responded, "Wym?," meaning either "what do you mean" or "who you and me?" K.C. texted back, "U wanna clutch?" and "N ill snatch the shi?" Morales responded, "Who n who just u n me?" K.C. confirmed, "Yeah" and "[w]e do it

made "based on the premise that the minor did, in fact, commit the offense" (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 682 (*Jones*)) and would nonetheless be amenable to treatment under the jurisdiction of the juvenile court (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 186 (*Kevin P.*).

rqq," meaning "real quick quick." A detective explained "thang" referred to a firearm and this text exchange was about "who was going to whip out the gun and who was going to snatch the bag of marijuana from the delivery driver."

At about 9:31 p.m., K.C. and Morales exchanged a series of text messages in which Morales expressed frustration the delivery driver was taking too long and K.C. told him to be patient or he would do it alone. At some point, K.C. sent Morales a location pin[3] showing K.C. at a point in between where Dominguez was shot and where he crashed his car.

At 10:11 p.m., K.C. called Sticky Green. At 10:18 p.m., Morales sent a video to his girlfriend showing a blue bandana tucked into his waistband while at the dead-end street, telling her, "Babe, we're on a mission." Between 10:25 and 10:46 p.m., K.C. made six calls to Sticky Green. After the final call at 10:46 p.m., Dominguez arrived at the dead-end street where K.C. and the others had been waiting. K.C. tried to grab the marijuana from Dominguez but when Dominguez tried to drive away, Morales shot him. K.C. and Morales ran to the car where Espinoza and his girlfriend had been waiting, and they all drove away.

Dominguez managed to drive about two blocks before he crashed into a tree on the side of the road. Police found him at about 10:54 p.m. He died of a single gunshot wound to the upper left back area. At the dead-end street where he was shot, detectives found one expended nine-millimeter Sig Luger cartridge casing.

About 30 minutes after Dominguez was found, Espinoza recorded K.C. flashing gang signs and pointing a gun at the camera. The morning after the

---

[3]    A location pin is a digital marker on a map used to indicate a specific place, helping users mark, find, and share locations.

4

shooting, K.C. made a tattoo appointment and the next day, got a large "S" for Sherman Heights tattooed on his face.

While detained in juvenile hall on the murder and attempted robbery charges, K.C. was involved in two fights, four instances of gang-related activities, and several instances in which he became upset and punched the wall or threatened staff and teachers. On one occasion, K.C. broke his glasses, threatened to stab officers if they entered his room, and said he was "ready to go to county" and that he would "kill y'all fuck staff." On December 31, 2024, K.C. and two juveniles "violently assaulted" another juvenile by punching and kicking him in the face. K.C. did not obey orders to "cover" and instead ran around yelling "Happy New Year 2025." Based on this New Year's eve incident, the District Attorney amended the petition to add count 3 for assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)).

## II.

### *Hearing on Motion to Transfer*

The juvenile court held a hearing on the People's motion to transfer K.C. from juvenile court to a court of criminal jurisdiction in April 2025, when K.C. was 17 years and five months old. As required by section 707, the probation department filed a 52-page transfer report addressing K.C.'s amenability for rehabilitation under the juvenile court's jurisdiction. This report detailed K.C.'s history of delinquency, individual and family history, prior probation interventions, the circumstances of the offenses charged, and a psychological evaluation of K.C. and recommendations for rehabilitative services by Dr. Julio-Cesar Armenta. Based on its evaluation, the probation department concluded K.C. was not suitable to remain under juvenile court jurisdiction and recommended his transfer to criminal court.

In addition to the transfer report and testimony from the authoring probation officer, the juvenile court considered Dr. Armenta's psychological evaluation report, testimony of gang experts presented by the prosecution and defense, and testimony of the defense psychologist, Dr. Abraham Loebenstein. After considering the evidence presented, the juvenile court ordered K.C.'s transfer to criminal court pursuant to section 707. From the bench, the court detailed the basis for its decision as to each criterion and found by clear and convincing evidence that K.C. is not amenable to rehabilitation while under the jurisdiction of the juvenile court.

DISCUSSION

I.

*Legal Framework*

"Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court. It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' (§ 707, subd. (a)(1).) The prosecution bears the burden of proving that the minor should be transferred. (Cal. Rules of Court, rule 5.770(a).)" (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*).)

"In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).) "[C]lear and convincing evidence demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt." (*Conservatorship of O.B.* (2020) 9 Cal.5th

6

989, 998.)  The evidence must "leave no substantial doubt."  (*In re Terry D.* (1978) 83 Cal.App.3d 890, 899.)

In making that determination, the court must consider five criteria: (1) the degree of criminal sophistication exhibited by the minor; (2) whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction;[4] (3) the minor's previous delinquent history; (4) success of previous attempts to rehabilitate the minor; and (5) the circumstances and gravity of the offense alleged in the petition to have been committed by the minor.  (§ 707, subd. (a)(3)(A)–(E).)  The weight given to each of the criteria is within the court's discretion.  (*Kevin P., supra*,  57 Cal.App.5th at p. 186.)

"A minor . . . is not required to establish innocence in order to show amenability to the juvenile court system."  (*Jones, supra*, 18 Cal.4th at p. 682.)  Instead, "the criteria . . . are based on the premise that the minor did, in fact, commit the offense" (*ibid.*), and the purpose is to determine whether the minor would nonetheless be amenable to treatment under the jurisdiction of the juvenile court (*Kevin P., supra*, 57 Cal.App.5th at p. 186). If the court decides to order a transfer of jurisdiction, it must recite the basis for its decision and include the reasons it found the minor was not amenable to rehabilitation under the juvenile court's jurisdiction.  (§ 707, subd. (a)(3).)

We review the juvenile court's order for abuse of discretion.  (*Miguel R., supra*, 100 Cal.App.5th at p. 165.)  " 'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review.  The trial court's findings of fact are

---

4      While the second criterion sounds similar, it is distinguishable from the ultimate determination that the court must make (whether the minor is amenable to rehabilitation while under juvenile court jurisdiction). (*Miguel R., supra*, 100 Cal.App.5th at pp. 167–168.)

7

reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' " (*Ibid.*)  The court's findings as to each of the specified criterion and its ultimate finding " 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court' " are findings of fact reviewed for substantial evidence.  (*Ibid.*)  We do not, however, reweigh the evidence nor substitute our discretion for the discretion exercised by the trial court.  (*In re J.S.* (2024) 105 Cal.App.5th 205, 211.)

## II.

### *Substantial Evidence Supports the Juvenile Court's Transfer Order*

We conclude the juvenile court's findings as to each of the statutory criteria and its final determination that K.C. was not amenable to rehabilitation while under the jurisdiction of the juvenile court are supported by substantial evidence.  We therefore conclude the court did not abuse its discretion by ordering K.C.'s transfer to the jurisdiction of the criminal court.

### A.    *Criminal Sophistication*

When evaluating the degree of criminal sophistication exhibited by the minor, the court was required to " 'consider the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime.' " (*Kevin P., supra*, 57 Cal.App.5th at p. 192.)  Factors for consideration include, but are not limited to, "the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of

8

childhood trauma; [and] the minor's involvement in the child welfare or foster care system[.]"  (§ 707, subd. (a)(3)(A)(ii).)

The juvenile court found K.C. exhibited criminal sophistication and this factor weighed in favor of his transfer to criminal court.  It found the evidence showed K.C. was "the leader of this operation" that led to Dominguez's death and that his conduct before and during the crimes showed a "significant degree of planning and coordination with his coparticipants."  Substantial evidence supports the court's findings.

It was K.C. who suggested to his fellow gang members that they commit armed robbery of a marijuana delivery service, identified the delivery service, placed the order for marijuana, provided the delivery address, and directed Morales and Espinoza as to how they would commit the armed robbery with him.  Indeed, at one point when Morales got frustrated with the wait time, K.C. instructed him to be patient and suggested he would do it alone if necessary.  K.C. led the operation despite being two years younger than Morales and five years younger than Espinoza.  The court also found K.C.'s conduct after the crimes "notable" in that he "celebrated" his role by getting a Sherman Heights tattoo on his face and boasted about it on social media.  The trial court reasonably found these circumstances demonstrated that K.C. was aware his role in calling the shots for the robbery-murder would "elevate his reputation with the gang."

K.C. views the evidence differently.  He argues his text messages with his coparticipants showed that they "worked out their roles among themselves," that K.C. "was in no position to demand or assign roles to his older accomplices," and that the way his crimes were carried out "has all the hallmarks of the rash, ill[-]considered action of a youth eager to impress older gang members who has given no consideration to the consequences."  K.C.'s

9

arguments, however, misapprehend our role in reviewing the record for substantial evidence. We do not reweigh the evidence. (*In re J.S., supra*, 105 Cal.App.5th at p. 211.)

K.C. further contends the juvenile court gave "little or no consideration" to his age, maturity, intellectual capacity, the effect of familial, adult, or peer pressure, his impetuosity or failure to appreciate risks and consequences, and childhood trauma. We disagree. The court began its evaluation of the criminal sophistication criteria by looking at K.C.'s childhood experiences and acknowledging he had witnessed domestic violence between his parents, that he had been a victim of physical abuse by his father up to the age of 10, and the additional traumatic experiences described in Dr. Armenta's report. It also stated that it understood the science behind adolescent brain development, specifically "how adolescent trauma, immaturity, and impetuosity, negative peer influence, substance use, and other factors can impact adolescent decision-making." The court, however, observed that although K.C. was 16 years old at the time of the robbery-murder, his own expert, Dr. Loebenstein, found that he "demonstrated a mixed or moderate degree of criminal sophistication," and that finding was made *without* having all the facts of the case.

The juvenile court also considered Dr. Loebenstein's opinion that K.C.'s crimes may have involved negative peer influence because he had posted "self-implicating criminal activity on social media as if seeking notoriety and approval from negative peers." But the court was not persuaded by Dr. Loebenstein's opinion because, in the court's words, "it wasn't very clear to the [c]ourt that he took the time to carefully consider any of the new information" and "[t]here was a lot of, quote, unquote, I don't recalls in his testimony. He appeared to blame peer influence on [K.C.'s] activity but didn't

10

give any significant weight to [K.C.'s] apparent leadership role in arranging the robbery." As the trier of fact, the court was free to discredit the expert witness's testimony (*In re J.S., supra,* 105 Cal.App.5th at p. 212), and we must give due deference to that determination (*Conservatorship of O.B., supra,* 9 Cal.5th at p. 996.)

Moreover, the juvenile court credited Dr. Armenta's evaluation in which he observed that K.C. "does not have any cognitive deficits that could account for limitations that may prevent his understanding of social roles. He noted [K.C.'s] IQ level to be on the low end but within the average range." Positive factors such as normal intellectual capacity "do not affirmatively demonstrate criminal sophistication," but they can support transfer "to the extent [the positive factors] fail to mitigate other evidence that does affirmatively demonstrate criminal sophistication." (*Kevin P., supra,* 57 Cal.App.5th at p. 193.) We conclude there is substantial evidence from which a reasonable trier of fact could find K.C.'s criminal sophistication weighed in favor of his transfer to criminal court.

B.    *Previous Delinquent History*

When evaluating a minor's previous delinquent history, the "juvenile court shall give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707, subd. (a)(3)(C)(ii).) Here, the court found K.C.'s history of delinquency weighed in favor of his transfer to criminal court. The court highlighted that K.C.'s history of delinquent behavior involves violence, including three prior true findings for attempted murder and two robberies, all with gang allegations, and that he has had

11

"multiple, multiple in-custody delinquent behavior." Substantial evidence supports the court's assessment of this criterion.

K.C. has been in the juvenile justice system since he was 14 years old. In July 2022, K.C. and several male juveniles robbed a man on the trolley. One of the perpetrators raised a fist as though he was going to strike or punch the victim, while another took the victim's backpack, demanded his wallet, and took $400 in Mexican pesos. When K.C. was arrested, he had the victim's AirPods and told the officer he was "Robbing n-----" and had thrown a knife in a nearby field. A petition charging him with robbery (Pen. Code, § 211) was found to be true. While detained on this petition, K.C. was involved in two fights and one unprovoked assault. On August 15, 2022, the court placed K.C. on home supervision with GPS monitoring and probation conditions. Almost immediately, K.C. violated probation, including by cutting off his GPS monitor.

Eleven days later, on August 26, 2022, K.C. and two other males were at a park when one of the males shot a person in the leg. K.C. and the two others ran to a nearby trolley station. A man followed K.C. and the others on his bicycle. The man caught up to K.C.'s group but turned around to flee when K.C. and another of his companions chased him. When the man fell off his bicycle, K.C.'s companion shot him. After the man was shot, K.C. stabbed him in the abdomen. Witnesses heard K.C. and the others yelling "Sherman" during the assaults. While police responded to the shootings, K.C. and his companions were brazenly robbing another person at the trolley station. K.C. approached the victim and told him not to mess with him because he had just killed someone. When K.C. was detained, police found him in possession of the robbery victim's EBT card, $7 in cash, and 9-millimeter ammunition.

One of K.C.'s companions had a 9-millimeter "ghost gun" and the other had a knife.

As a result of these August crimes, a second petition charging K.C. with attempted murder (Pen. Code, §§ 664, 187, subd. (a)) and robbery (*id.*, § 211), with allegations both were committed for the benefit of a criminal street gang (*id.*, § 186.22, subd. (b)(1)), were found to be true. While in custody pending the disposition hearing, K.C. was involved in 11 assaults against other detainees, at least four of which were gang related. K.C. also spit at another detainee and a supervisor, threw chairs during a unit disturbance, and exposed himself to an officer. At the November 15, 2022, disposition hearing, the court declared K.C. a ward of the court, continued his detention in juvenile hall, and committed him to Urban Camp for a maximum period of 250 days.

In March 2023, the juvenile court held a special hearing in which it considered a probation report detailing that while at the Youth Transition Campus, K.C. was involved in a fight in which both participants exchanged closed fist punches. K.C. had three additional rule violations due to using gang signs, speaking in a negative manner, and tagging gang-related verbiage in his room. During that time, K.C. "instigated a unit disturbance" in which he tried to convince the unit to stage a "[t]ake over." While detained, K.C. completed the high-risk substance abuse program and his clinician reported progress in his maturity. The court ordered K.C. detained at his mother's home with a GPS monitor and under the continued care, custody, and control of the probation officer.

Upon his release, K.C. was ordered to participate in the CHOICE program and Substance Use Disorder Services program. But he absconded before starting the programs. K.C.'s mother reported he was not staying

13

home every night and was gone for days at a time. On April 21, 2023, K.C. was remanded into custody for violating his probation. At a May 15 disposition hearing, the court ordered K.C. committed to the Healing Opportunities for Personal Empowerment (HOPE) program for a maximum period of 480 days. During the time between his arrest and transfer to HOPE, K.C. was involved in five assaults, four of which were gang related K.C. also hid his medication refusing to take it, placed a tray of feces on the staff desk, made sexual comments to staff, and faked a medical emergency.

During his HOPE commitment, K.C. participated in therapy, substance use counseling, life skills courses, and attended school. He was also involved in three fights, used inappropriate language, punched his wall when upset, and got a new tattoo of three dots under his eye. Officers reported K.C.'s behavior was negative 95 percent of the time and that he instigated fights. On December 7, 2023, K.C. was released from custody with GPS monitoring. He was referred to a mentoring program and a substance use program, and he was placed on high-risk gang probation. On December 20, during a search of K.C.'s home, the probation officer found two vape pens in his bedroom. On February 7, 2024, during a search of K.C.'s home, the probation officer found "gang[-]related tagging." At around this same time, K.C. failed to comply with drug testing conditions and failed to appear for scheduled appointments with probation.

On March 12, 2024, K.C. texted people looking to purchase or trade a gun with cash. On March 27, K.C. asked someone with the username "t1nyknucckles" via Instagram to trade firearms because he "might get busted tmr n ion wanna have a big ass shotgun for when I get out yk." K.C. told t1nyknucckles he was accused of shooting two people and t1nyknucckles

14

told him that was "respectable." K.C. said he knew what he signed up for and had done his time for it.

The juvenile court also considered the effect that K.C.'s family and community environment, and his childhood trauma may have had on his delinquency. In doing so, the court considered the testimony of the defense gang expert, Jose Nogales, who attributed "immaturity and trauma [to] K.C.'s behavior." But it did not credit Nogales's testimony because he had not worked with K.C. "over any significant period of time" and he was not a mental health professional. The court acknowledged Nogales's opinion that K.C.'s "violent acts are due to immaturity and in response to trauma may in part be true," but it found "the factors the [c]ourt must consider are so much more complicated than the simplistic approached presented by" Nogales. It thus found that Nogales's "observations were only minimally helpful."

K.C. resists the court's credibility determination and holds up Nogales's testimony as "strong evidence that [K.C.'s] record of delinquencies, probation violations and disciplinary violations in juvenile hall did not mean that he was irreparably corrupt and that he could not be rehabilitated in the juvenile system." He asserts the court "chose to ignore this testimony." We disagree that the court ignored Nogales's testimony; it simply did not give it all the weight K.C. believes it is entitled. As we have already stated, the court was free to give whatever credit it believed an expert witness's testimony was due and we do not reweigh that assessment. (*In re J.S., supra*, 105 Cal.App.5th at p. 212.)

On this record, the court reasonably concluded K.C.'s prior history of serious delinquent behavior weighed in favor of his transfer.

15

C.    *Previous Rehabilitation*

When evaluating the minor's previous rehabilitation, the "court shall give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs." (§ 707, subd. (a)(3)(D)(ii).)  Here, the juvenile court recounted the juvenile court's numerous attempts at rehabilitation.

It noted that after K.C. was first adjudged a ward of the juvenile court in 2022, he was released to the community but violated his probation and was committed to Urban Camp where he accumulated 19 incidents involving rules violations.  He was then released to the community and placed on home supervision with GPS monitoring.  He was referred to the CHOICE program and was scheduled to participate in anger management, but he did not do so.  Instead, he absconded.  In May 2023, K.C. was committed to the HOPE program, which the court observed was the highest level of custodial intervention, next to Secure Track.  But after he was released from HOPE and placed on home supervision with GPS tracking in December 2023, K.C. violated the terms of his release and was remanded to custody on April 4, 2024.  It was during this period of his release that in March 2024 K.C. allegedly committed the robbery-murder of Dominguez.

From this substantial evidence, the court reasonably found that K.C. "has had the opportunity to reform from probation supervision, a lengthy Urban Camp commitment, participation in the HOPE program, and other probation-directed resources and programs" and "[t]here have been multiple previous attempts by the [j]uvenile [c]ourt to rehabilitate [K.C.] with no success."  The court found this criterion weighed in favor of transfer.

Relying again on Dr. Loebenstein's and Nogales's opinions, which as we discussed the court did not find entirely persuasive, K.C. argues he did show

16

progress and "there are still things that the [j]uvenile [c]ourt can do for [him]," such as providing the mentor relationship discussed by Nogales. He asserts the problem, however, is that "the probation department and the court are very impatient," wanting "results to manifest more quickly than reasonably and realistically possible." We disagree. Contrary to the arguments of K.C.'s appellate counsel, the services were tailored to meet K.C.'s specific needs and were provided both in and out of custody to facilitate continued progress in the community. But he chose not to avail himself of these services. We conclude there is substantial evidence from which a reasonable trier of fact could conclude that K.C. received adequate services. And despite the adequacy of the services, K.C. reverted to criminal activity. Thus, a reasonable trier of fact could conclude K.C.'s delinquency history weighed in favor of transfer. On this record, we conclude this finding, too, is supported by substantial evidence.

D.    *Potential for Rehabilitation During Juvenile Court's Jurisdiction*

When evaluating whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction, the "court shall give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature." (§ 707, subd. (a)(3)(B)(ii).) Here, given his age of 17 years and five months, the juvenile court noted that it had "over seven years to work towards [K.C.'s] rehabilitation," which was "a significant amount of time for [K.C.] to grow and mature."

But the court found that K.C.'s history while under the juvenile court's supervision gave it "very little evidence to hang [its] hat on, . . . to give [the court] hope that he can and will take advantage of rehabilitative services available to him" in juvenile court. The court noted K.C.'s "lack of progress during previous interventions, his continuing violent behavior while in

17

custody, his lack of participation in therapeutic supports currently available to him, and his failure to implement skills learned from all the services that have been offered suggest his prospects for successful rehabilitation within the [j]uvenile [c]ourt's jurisdiction is poor." It thus found this criterion weighed in favor of K.C.'s transfer to criminal court. Substantial evidence supports this finding, too.

K.C. failed to participate in services while out in the community, as demonstrated by his arrests for probation violations, new violent offenses within months of release from custody. And his supervision while in detention did not deter his involvement in over 90 assaults, gang-related fights, and disrespectful behavior while in custody even when facing the possibility of transfer to criminal court. The court considered the probation officer's statements that the most recent behavioral incidents occurred just the month before the transfer hearing and that K.C.'s behavior did not show a desire to change. The court also considered Dr. Armenta's assessment that K.C. did not appear concerned with how his behavior affected others.

The court went on to express concern with the lack of protective factors to aid in K.C.'s rehabilitation, including the lack of relationship with his father, the limited contact with his mother while in custody, and his mother's statements that she has difficulty controlling him. The court considered it significant that while K.C. did participate in required therapy programs and psychoeducational groups, he was not currently participating in therapy or taking his medications. Despite the seriousness of K.C.'s offenses, the possibility of a transfer to adult court, and the fact he had been in custody for over a year, the court stressed that K.C. had only provided a handful of program participation certificates, had not developed a relationship with a therapist, and had not reconsidered taking his medication.

18

The court highlighted Dr. Loebenstein's report finding that K.C. failed to take responsibility for some of his prior offenses by denying a prior robbery claiming he was "just there," and describing the attempted robbery as self-defense. In his interview with Dr. Armenta, K.C. again minimized his conduct, saying one of his friends shot someone but neglecting to mention that he stabbed the victim and claiming there is no evidence that he was involved in the murder of Dominguez, the delivery driver.

The court found that Dr. Loebenstein's and Nogales's assessments that K.C. was on a path towards rehabilitation were supported by little evidence given that Dr. Loebenstein did not have the benefit of the transfer report outlining K.C.'s continued violent behavior and Nogales had not worked with K.C. over a significant period of time. As a result, the court found Dr. Loebenstein's testimony in that area "perplexing" and Nogales's observations as "only minimally helpful."

In concluding its analysis, the court again highlighted that the juvenile court would have "over seven years to work with [K.C.]'s rehabilitation" which is "a lot of time," but "[K.C.]'s delinquent behavior began in 2017, approximately eight years ago," which is "also a lot of time."

In sum, we conclude substantial evidence supports the court's finding that this criterion also weighed in favor of K.C.'s transfer to criminal court.

E.     *Circumstances and Gravity of the Charged Offenses*

When evaluating the circumstances and gravity of the charged offenses, the court "shall give weight to any relevant factor, including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually

19

caused by the person, and the person's mental and emotional development."[5] (§ 707, subd. (a)(3)(E)(ii).)  The court found this criterion weighed in favor of transfer, too.

The court stressed the gravity of the offenses was "quite clear" and that the evidence suggested K.C. "was the mastermind behind events that culminated in the cold-blooded murder."  K.C.'s actions before, during, and after the murder made it clear that K.C. knew what he was doing when "he directed the actions of older gang members and planned the robbery turned murder."  K.C. resists this conclusion by arguing the evidence "is far from clear" that he was the mastermind of the robbery-murder and that there is "no evidence" that he "expected let alone intended the robbery . . . would end in murder."  We reject these arguments because they, again, improperly invite us to reweigh the evidence.  (*In re J.S., supra*, 105 Cal.App.5th at p. 211.)  We also disagree with K.C.'s view of the evidence.  K.C. did not merely "mention[ ] the use of a gun," as he argues in his appellate briefing.  K.C. told Morales to bring out the gun and K.C. would snatch the marijuana from the delivery driver.

The court also believed K.C.'s "callousness and cruelty [was] underscored by his choice to get a large gang-related face tattoo to celebrate his role in the murder."  K.C. concedes the "court may be correct" when it determined K.C.'s act of tattooing his face was " 'to celebrate' and that it shows 'callousness and cruelty.' "  Given his concession, it is of no moment under our substantial evidence review that K.C. can point to evidence that he

---

[5]    The court should also consider any evidence indicating the victim trafficked, sexually abused, or sexually battered the minor.  (§ 707, subd. (a)(3)(E)(iii).)  No such evidence exists in this case.

told Dr. Armenta "he was 'not thinking' " when he got the tattoo. Finally, the court noted Dr. Armenta's assessment that K.C. did not have any cognitive deficits that could prevent his understanding of social rules. K.C.'s efforts to credit Dr. Lobenstein's opinion he was driven by impulsivity and peer acceptance, again, misconstrues the governing standard of review. On the record we have summarized, the court's finding that this criterion weighed in favor of K.C.'s transfer to the criminal court is supported by substantial evidence.

F.    *Conclusion*

In sum, considering each of the five criterion and viewing the record as a whole, we conclude there is substantial evidence from which a reasonable trier of fact could make the ultimate finding, concluding by clear and convincing evidence, that K.C. was not amenable to rehabilitation while under the jurisdiction of the juvenile court. The increasing severity of K.C.'s criminal behavior, his actions that consistently frustrated the probation department's and juvenile court's efforts to rehabilitate him, and his unwillingness to abandon the gang-life mentality even while in custody for murder—and presumably aware of the detrimental impact this behavior might have on his effort to oppose the People's transfer motion—sufficiently supports the court's conclusion that K.C. would not be amenable to rehabilitation within the jurisdiction of the juvenile court.

On appeal, K.C. argues the court's reasons are based on the flawed premise that K.C.'s past conduct has "indelibly and permanently marred his character" such that any rehabilitative program offered by the juvenile court would fail. However, the court specifically noted that K.C.'s "needs are complex and required prolonged treatment and supervision beyond what the

21

[j]uvenile [c]ourt jurisdiction can offer," not that he is beyond reform.
Accordingly, we affirm.

## DISPOSITION

The juvenile court's order is affirmed.


DO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DATO, J.